Tina Wolfson, SBN 174806
twolfson@ahdootwolfson.com
Theodore W. Maya, SBN 223242
tmaya@ahdootwolfson.com
Bradley K. King, SBN 274399
bking@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
1016 Palm Avenue
West Hollywood, California 90069
Tel: 310-474-9111
Fax: 310-474-8585

Counsel for Plaintiff and the Proposed Class

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### San Francisco Division

| | |
|---|---|
| IAN DEDRICK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SNACK FACTORY, LLC, a New Jersey limited liability company,<br><br>Defendant. | Case No. 3:15-cv-1605<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>1. Breach of Express Warranty<br>2. Violations of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*<br>3. Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4. Violations of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*<br>5. Negligent Misrepresentation |

CLASS ACTION COMPLAINT

Plaintiff Ian Dedrick ("Plaintiff"), by and through his counsel, brings this Class Action Complaint against Defendant Snack Factory, LLC ("Defendant"), on behalf of himself and all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This is a consumer protection and false advertising class action. Defendant markets, advertises, and distributes Pretzel Crisps (collectively, as detailed by flavor below, the "Products"), which it prominently advertises as "All Natural." The Products are not all natural. The Products contain unnatural, synthetic, artificial, and/or genetically modified ingredients, including but not limited to maltodextrin, soybean oil, malt syrup (corn syrup malt extract), citric acid, dextrose, cornstarch, modified food starch, and caramel color. A genetically modified ("GM") ingredient, such as the maltodextrin and dextrose contained within the Products, is an ingredient whose genetic material has been altered by humans using genetic engineering techniques. The World Health Organization defines GM organisms (which include crops) as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally." GM crops are not natural, but man-made. There are wide-ranging controversies related to GM crops, including health risks from ingesting foods derived from GM crops and negative environmental effects associated with growing GM crops. The use and labeling of GM foods is the subject of a variety of laws, regulations, and protocols worldwide.

2. Although the Products are made from artificial and GM ingredients, Defendant knowingly, recklessly, and/or negligently markets the Products as being "All Natural." Defendant labels the Products as "All Natural" because consumers perceive all natural foods as healthier, better, and more wholesome. The market for all natural foods has grown rapidly in the past few years, a trend Defendant seeks to take advantage of through false and misleading advertising.

3. Additionally, any consumer who purchased the Products – irrespective of their motivation for purchasing the Products – suffered harm in the form of a higher price that Defendant was able to command for the Products based on the false representation that they are "All Natural."

4. Plaintiff brings claims against Defendant individually and on behalf of a class of all

other similarly situated purchasers of the Products in California for: (1) breach of express warranty (under the common law of California); (2) violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (3) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (4) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; and (5) negligent misrepresentation (under the common law of California).

5. Plaintiff seeks a Court order requiring Defendant to, among other things: (1) cease the unlawful marketing; (2) conduct a corrective advertising campaign; and (3) pay damages and restitution to Plaintiff and Class members.

**PARTIES**

6. Plaintiff Ian Dedrick is a consumer residing in San Francisco, California.

7. Defendant Snack Factory, LLC, is a New Jersey limited liability company with its principal place of business located in Charlotte, North Carolina. Defendant manufactures, markets, and distributes the Products to consumers in California and throughout the United States.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d). The aggregated claims of the individual class members exceed $5,000,000, exclusive of interest and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Defendant, on the other, are citizens of different states.

9. This Court has jurisdiction over Defendant because it has sufficient minimum contacts in California or otherwise intentionally avails itself of the markets within California through the promotion, sale, marketing, and distribution of the Products sold in California, to render the exercise of jurisdiction by this Court proper and necessary.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because Plaintiff is a resident of this District, Defendant regularly conducts business throughout this District, and a substantial part of the events and/or omissions giving rise to this action occurred in this District. The Declaration of Tina Wolfson regarding venue, pursuant to Cal. Civ. Code § 1780(c), is submitted concurrently with this Complaint and is fully incorporated herein by reference.

11. Intra-district Assignment: pursuant to Civil Local Rules 3-2(c), a substantial part of the

events or omissions that give rise to the claims herein occurred in San Francisco County, and it is therefore appropriate to assign this action to the San Francisco Division.

**FACTUAL ALLEGATIONS**

**A.      Defendant Deceptively Labels The Products As "All Natural"**

12.     Throughout the Class Period, Defendant has prominently and conspicuously labeled and advertised the Products as "All Natural." The labeling and marketing on the Products communicates a straightforward, material message, which is that the Products are 100% natural. However, unbeknownst to consumers, the Products are actually comprised of synthetic, artificial, highly processed, and/or genetically modified ingredients.

13.     The core deceptive, false, and misleading representations that Pretzel Crisps are "All Natural" are conspicuously and prominently placed on the Products' labels for every person to see as soon as they pick up the Products to read the label. By way of illustration, the "All Natural" representations on the Products' labels appear within a prominent circular symbol to the right of an image of stacked Pretzel Crisps, like this:



3
CLASS ACTION COMPLAINT

14. By conspicuously and prominently placing the "All Natural" label on the Products, Defendant has ensured that all consumers purchasing the Products would be exposed to its "All Natural" claim.

15. As a result of Defendant's false advertising, Plaintiff and Class members purchased Products that they otherwise would not have purchased, or paid more for the Products than they would be willing to pay had the Products not been labeled "All Natural."

**B.  The Products Are Not "All Natural" Because They Contain Artificial, Synthetic, Highly Processed, and/or Genetically Modified Ingredients**

16. Defendant misleads consumers by representing that the Products are "All Natural," when in fact they contain highly processed and artificial ingredients. Specifically, the Products contain, without limitation: maltodextrin, citric acid, soybean oil, malt syrup (corn syrup malt extract), modified food starch, cornstarch, dextrose, hydrolyzed soy protein, soy lecithin, and caramel color. Not only are these ingredients synthetic, they are also derived from genetically modified organisms ("GMO" or "GMOs"). As discussed more thoroughly below, GMOs are not natural.

17. The Products, without limitation, are available in the following flavors, which contain one or more of these artificial, synthetic, highly processed, and/or GMO ingredients, and have been and/or continue to be marketed as "All Natural" during the Class period defined below:

    a. Cheddar Horseradish (maltodextrin, modified food starch, citric acid, soybean oil, malt syrup).
    b. Cinnamon Toast (soybean oil, malt syrup);
    c. Classic (malt syrup);
    d. Everything (malt syrup);
    e. Garlic Parmesan (maltodextrin, modified food starch, soybean oil, malt syrup);
    f. Honey Mustard & Onion (maltodextrin, dextrose, hydrolyzed soy protein, citric acid, soybean oil, malt syrup);

   g. Minis Cheddar (maltodextrin, disodium inosinate, disodium guanylate,[1] soybean oil, malt syrup);

   h. Minis Original (malt syrup);

   i. Original (malt syrup);

   j. Sea Salt & Cracked Pepper (dextrose, maltodextrin, modified food starch, citric acid, disodium inosinate, disodium guanylate, caramel color, soybean oil, malt syrup);

   k. Sesame (malt syrup);

   l. Supreme (malt syrup); and

   m. Tuscan Three Cheese (soybean oil, citric acid, soy lecithin, malt syrup).

18. Maltodextrin, used in processed foods as filler and to enhance texture and color, is produced through acid and enzymatic hydrolysis of cornstarch.  The acid hydrolysis process is a severe process that renders an ingredient no longer natural.  Maltodextrin is a white powder primarily found in processed foods where it is used as a thickener or filler.  It is a synthetic, factory-produced texturizer that is created by complex processing that does not occur in nature, including refining, purification, and concentration. Maltodextrin is derived from GMO corn.

19. Dextrose is enzymatically synthesized in a similar manner to maltodextrin, also derived from GMO corn.  Synthetic chemicals are used to extract and purify the enzymes used to produce maltodextrin and dextrose.  The microorganisms, fungi, and bacteria used to produce these enzymes are also often synthetically produced.

20. Modified food starch is used as an emulsifier or thickener in processed foods.  It is prepared by treating starch (GMO corn) with inorganic acids, such as hydrochloric acid and hydrogen peroxide, to break down the starch molecule and reduce viscosity.  Maltodextrin is a type of modified food starch.  Cornstarch, derived from GMO corn, is also used as a thickening agent in processed foods.  After undergoing a five-step wet milling process, cornstarch is typically modified using acids and other synthetic treatments for use in processed foods.

21. Caramel color is chemically-derived to add color to processed food products by using

---

[1] Disodium inosinate and disodium guanylate are food additives found in processed snack foods.  Used as flavor enhancers, these additives are chemically-derived from dried meat, fish, or seaweed.

sulfuric acid, phosphoric acid, and/or ammonium hydroxide to heat carbohydrates (GMO corn) to such high temperatures that the final ingredient does not chemically resemble its sources.

22. Malt syrup is an unrefined sweetener that contains synthetically-derived complex carbohydrates such as corn syrup (derived from GMO corn).

23. Citric acid is synthetically produced for use as a food preservative by feeding mold cultures with sugars derived from corn steep liquor, hydrolyzed corn starch, or other inexpensive sugary solutions (derived from GMO corn).

24. Hydrolyzed soy protein is a food additive used to resemble bouillon or broth flavoring. It is chemically produced by "cooking" defatted soybeans (GMOs) at high temperature for eight hours in hydrochloric acid. The resulting liquid is then further processed, refined, and fortified with additional flavoring components.

25. Soy lecithin, derived from GMO soybeans, is used in food as an emulsifier, lubricant, and preservative. Soy lecithin is extracted from soybeans by immersing them in hexane, a byproduct of petroleum refining, before further processing.

26. Soybean oil, derived from GMO soybeans, is so heavily processed that it no longer is chemically the same as the oils originally extracted. The various processes by which the raw ingredients are converted to this cooking oil renders it chemically-derived and non-natural. While it retains the non-natural genetic attributes of the GM soybean crops from which it sourced, soybean oil no longer bears any natural chemical resemblance to its source crop as a result of the extensive process by which it is refined.

27. Many types of oil are extracted through processes that allow the oils to retain the chemical composition occurring in nature. Cold pressed olive oil, for example, is produced through a mechanical process of compressing the oil from olives. Chemicals can also be used in the extraction process to obtain a higher yield of oil. However, chemically, the oil at the end of the process is the same as it was at the beginning of the process. In contrast, the processes used to create soybean oil go well beyond mere extraction techniques, resulting in chemically altered goods. Soybean oil undergoes several distinct chemical processes: extraction, alkali-neutralization, bleaching, deodorizing, and conditioning.

a. To extract crude oil from soybeans, the manufacturer first applies a physical press to the vegetable, which typically extracts a fraction of the extractable oil. As part of the extraction process, the vegetables are then treated with hexane, a carcinogenic chemical linked to cancer and other major health problems in studies conducted on animals, to extract the remaining crude oil. Residual hexane may be present in the final cooking oil.

b. After it has been extracted from the vegetable, the crude oil is neutralized with an alkaline soap solution that separates and removes the free fatty acids ("FFAs"). The soap solution is typically separated from the neutralized oil by centrifugal separation. Potassium hydroxide, a corrosive acid, is used to facilitate the reaction between the alkaline solution and FFAs.

c. After neutralization, the oil is bleached and deodorized with additional cleaning solutions to lighten the oil's color and minimize its odor.

d. After being bleached and deodorized, the oil is conditioned by the use of a high-concentration phosphoric acid, consumption of which has been linked to lower bone density as well as chronic kidney disease.

**C.     Food Derived From Genetically Modified Organisms Is Not All Natural**

28.     Genetically modified crops do not occur in nature, and as such are not "All Natural." On the contrary, genetically modified crops are crops that are genetically manipulated from their natural state. For example, Monsanto, one of the largest producers of genetically modified crop seed, defines genetic modification (or genetic engineering) to mean "[t]he technique of removing, modifying or adding genes to a living organism via genetic engineering or other more traditional methods. Also referred to as gene splicing, recombinant DNA (rDNA) technology or genetic engineering." Monsanto also defines Genetically Modified Organisms ("GMO") as "[p]lants or animals that have had their genetic makeup altered to exhibit traits that are not naturally theirs. In general, genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism."[2]

---

[2] *See* Monsanto Glossary, *available at* http://www.monsanto.com/newsviews/pages/glossary.aspx#g (last visited Apr. 7, 2015).

29. The World Health Organization's ("WHO") definition of GMO is consistent with Monsanto's definition: "Genetically modified (GM) foods are foods derived from organisms whose genetic material (DNA) has been modified in a way that does not occur naturally, e.g. through the introduction of a gene from a different organism."[3] WHO also cautions that "[a]ll GM foods should be assessed before being allowed on the market."[4]

30. The United States Environmental Protection Agency ("EPA") for Prevention, Pesticides, And Toxic Substances, has distinguished between conventional breeding of plants "through natural methods, such as cross-pollination" and genetic engineering. "Conventional breeding is a method in which genes for pesticidal traits are introduced into a plant through natural methods, such as cross-pollination." "Genetically engineered plant-incorporated protectants are created through a process that utilizes several different modern scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material."[5]

31. Romer Labs, a company that provides diagnostic services to the agricultural industry, including tests to detect and determine the existence of GM crops, defines GM crops as "[a]griculturally important plants [that] are often genetically modified by the insertion of DNA material from outside the organism into the plant's DNA sequence, allowing the plant to express novel traits that normally would not appear in nature, such as herbicide or insect resistance. Seed harvested from GMO plants will also contain these modifications."[6]

32. As indicated by the various industry, government and health protection agency organizations cited above, GM crops and GMOs are not "all natural." In addition, ingredients made from GM crops and GMOs are not "all natural."

---

[3] *See* WHO Health Topics: Food, Genetically Modified, *available at* http://www.who.int/topics/food_genetically_modified/en/ (last visited Apr. 7, 2015).
[4] *Id.*
[5] *See* EPA Questions & Answers, Biotechnology: Final Plant-Pesticide/Plant Incorporated Protectants (PIPs) Rules, dated July 19, 2001, *available at* http://www.epa.gov/scipoly/biotech/pubs/qanda.pdf (last visited Apr. 7, 2015).
[6] *See* Romer Labs, Knowledge: Genetically Modified Organisms, *available at* http://www.romerlabs.com/en/knowledge/gmo/ (last visited Apr. 7, 2015).

33.     The United States Department of Agriculture ("U.S.D.A") estimates that, as of 2014, approximately 94% of soybeans and 89% of corn grown in the United States is genetically modified.[7]

34.     The market for natural products is large and ever growing and consumers are willing to pay a premium for products they believe to be natural, healthy, and/or organic. Natural Foods Merchandiser magazine's 2013 Market Overview reported significant growth for the natural and organic products industry. Gleaning more than $89.4 billion dollars in revenue in 2013 alone, the industry grew ten-and-a-half percent (10.5%) from 2012, revealing that consumers' desire for natural products is huge and continues to grow.

**D.    Defendant's False And Misleading Advertising Is Likely To Deceive Reasonable Consumers**

35.     Defendant's false and misleading representations and omissions are likely to deceive Plaintiff and other reasonable consumers.

36.     Reasonable consumers must and do rely on food label representations and information in making purchase decisions.

37.     Defendant's statement that the Products are "All Natural" is material to a reasonable consumer's purchase decision because reasonable consumers, such as Plaintiff and Class members, care whether food products contain unnatural, synthetic, artificial, highly processed, and/or GM ingredients, especially when a product claims to be "All Natural."

38.     Reasonable consumers attach importance to an "All Natural" claim when making a purchasing decision.

39.     According to a June 2014 consumer survey conducted by Consumer Reports, more than eight out of ten consumers believe that packaged foods carrying the "natural" label should come from food that contains ingredients grown without pesticides (86%), do not include artificial ingredients (87%), and do not contain GMOs (85%).[8]

---

[7] *See* USDA Economic Research Service, Adoption of Genetically Engineered Crops in the U.S.: Recent Trends in GE Adoption, *available at* http://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us/recent-trends-in-ge-adoption.aspx (last visited Apr. 7, 2015).
[8] *See* Yahoo Finance, Consumer Reports Survey: Majority of Americans Look for 'Natural' Label When Shopping, Believe it Carries Benefits Despite the Contrary, *available at*

40.     Defendant markets and advertises the Products as "All Natural" to increase sales derived from the Products.  Defendant is well aware that claims of food being "All Natural" are material to reasonable consumers.

41.     Upon information and belief, in making the false, misleading, and deceptive representations and omissions, Defendant knew and intended that consumers would pay a price premium for the Products over comparable products that are not labeled "All Natural," furthering Defendant's private interest of increasing sales for the Products, and decreasing the sales of products by Defendant's competitors that do not claim to be "All Natural."

**E.     Plaintiff's Reliance And Damages**

42.     Plaintiff purchased the Products, including the "Original" and "Everything" flavors, from a Safeway supermarket located at 2020 Market Street, San Francisco, California 94114 for the purchase price of approximately $3.00 to $3.50 within the applicable Class period as defined below.

43.     The packaging of the Products that Plaintiff purchased contained the representation that the Products were "All Natural."

44.     Plaintiff believed Defendant's representation that the Products are "All Natural." Plaintiff relied on the "All Natural" representation in making his purchase decisions.  Plaintiff would not have purchased the Products had he known they were not, in fact, "All Natural."

45.     Plaintiff paid for "all natural" products, but he received Products that was not "All Natural."  Specifically, he received Products containing ingredients that were unnatural, synthetic, artificial, highly processed, and/or genetically modified.

46.     The Products Plaintiff received were worth less than the products for which he paid. Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

47.     Plaintiff and Class members would not have purchased the Products had they known that they were derived from ingredients that are not "All Natural," and/or would not have paid as much as they did for the Products if they were not falsely advertised as "All Natural."

---

http://finance.yahoo.com/news/consumer-reports-survey-majority-americans-100000330.html (last visited Apr. 7, 2015).

10

CLASS ACTION COMPLAINT

**CLASS ACTION ALLEGATIONS**

48.     Plaintiff seeks relief in his individual capacity and as representatives of all others who are similarly situated.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), Plaintiff seeks certification of a class initially defined as follows:

> All California residents who purchased, for personal use, one or more of the Pretzel Crisps Products identified in this Complaint containing an "All Natural" statement, during the four (4) years preceding the date of filing the Complaint up through the date notice is provided to the Class.

49.     Excluded from the Class is Defendant, including any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendant.  Also excluded are the judges and court personnel in this case and any members of their immediate families, as well as any person who purchased the Products for the purpose of resale.

50.     Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division into subclasses after having had an opportunity to conduct discovery.  This specifically includes, without limitation, amending the Class definition to include a National class and/or any other appropriate state specific subclasses.

51.     <u>Numerosity</u>.  Fed. R. Civ. P. 23(a)(1).  Each Class is so numerous that joinder of all members is unfeasible.  While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that millions of consumers have purchased the Products during the Class period.

52.     <u>Commonality</u>.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to each Class member, which predominate over any questions affecting only individual members of the Class.  These common questions of law and fact include, without limitation:

    a.     Whether Defendant falsely and/or misleadingly misrepresented the Products as being "All Natural";

    b.     Whether Defendant's misrepresentations are likely to deceive reasonable consumers;

    c.     Whether Defendant breached express warranties;

      d.      Whether Defendant violated California's Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*;

      e.      Whether Defendant violated California's Unfair Competition Law, California Business & Professions Code § 17200, *et seq.*;

      f.      Whether Defendant violated California's False Advertising Law, California Business & Professions Code § 17500, *et seq.*;

      g.      Whether Defendant committed negligent misrepresentation; and

      h.      The nature of the relief, including equitable relief, to which Plaintiff and Class members are entitled.

53.    <u>Typicality</u>.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class.  Plaintiff and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendant's unlawful conduct.

54.    <u>Adequacy of Representation</u>.  Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of Class members.  Further, Plaintiff's counsel is competent and experienced in litigating class actions.

55.    <u>Superiority of Class Action</u>.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this action since joinder of all Class members is impracticable and will waste judicial resources.  Moreover, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting outcomes.  Finally, there will be no difficulty in managing this action as a class action.

56.    <u>Injunctive and Declaratory Relief</u>.  Fed. R. Civ. P. 23(b)(2).  Defendant's misrepresentations are uniform as to all Class members.  Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Breach of Express Warranty

57.    Plaintiff incorporates all previous factual allegations as if fully set forth herein.

58.    Plaintiff and other members of the Class formed a contract with Defendant at the time

they purchased the Products. The terms of that contract include the promises and affirmations of fact Defendant makes on the Products' packaging and through marketing and advertising, including Defendant's promise that the Products are "All Natural," as described above. This marketing and advertising constituted an express warranty and became part of the basis of the bargain, and are part of the standardized contract between Plaintiff and Class members, on the one hand, and Defendant, on the other.

59. All conditions precedent to Defendant's liability under this contract have been performed by Plaintiff and Class members when they purchased the Products for their ordinary purposes.

60. At all times relevant to this action, Defendant has breached its express warranty for the Products because the Products are not "All Natural," as they are made from synthetic, artificial, highly processed, and/or genetically modified ingredients that are not all natural.

61. As a result of Defendant's breach of its express warranty, Plaintiff and Class members were damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

**Violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.***

62. Plaintiff incorporates all previous factual allegations as if fully set forth herein.

63. This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA"), because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

64. Plaintiff and each member of the Class are "consumers" as defined by Civil Code § 1761(d). Defendant intended to sell the Products.

65. The Products are "goods" within the meaning of Civil Code § 1761(a).

66. Defendant violated the CLRA in at least the following respects:

    a. in violation of § 1770(a)(2), Defendant misrepresented the source of the ingredients of the Products as "All Natural," when they were not (because they contain artificial, synthetic, highly processed, and/or genetically modified ingredients);

   b. in violation of § 1770(a)(5), Defendant represented that the Products have characteristics, ingredients, and benefits ("All Natural") that they do not have (because they contain artificial, synthetic, highly processed, and/or genetically modified ingredients);

   c. in violation of § 1770(a)(7), Defendant represented that the Products are of a particular standard, quality, or grade ("All Natural") when they are of another (containing artificial, synthetic, highly processed, and/or genetically modified ingredients);

   d. in violation of § 1770(a)(9), Defendant has advertised the Products (as "All Natural") with intent not to sell them as advertised (containing artificial, synthetic, highly processed, and/or genetically modified ingredients); and

   e. in violation of § 1770(a)(16), Defendant represented that the Products have been supplied in accordance with previous representations ("All Natural"), when they were not (because they contain artificial, synthetic, highly processed, and/or genetically modified ingredients).

67. Defendant violated the CLRA by representing the Products as "All Natural" when the Products were not all natural.  Defendant knew, or should have known, that the representations and advertisements were false and misleading.

68. Defendant's acts and omissions constitute unfair, deceptive, and misleading business practices in violation of Civil Code § 1770(a).

69. Pursuant to the notice requirements under the CLRA, on April 8, 2015, Plaintiff notified Defendant in writing, by certified mail, of the violations alleged herein and demanded that Defendant remedy those violations within thirty (30) days of receipt.  In the event Defendant fails to adequately respond within the mandated 30-day time period, Plaintiff intends to amend this Complaint to include a request for injunctive relief pursuant to the CLRA.

70. Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to the public.

### THIRD CAUSE OF ACTION

**Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.***

71. Plaintiff incorporates all previous factual allegations as if fully set forth herein.

72. Defendant committed unlawful, unfair, and/or fraudulent acts in violation of the Unfair

Competition Law, California Business & Professions Code § 17200, *et seq.* (the "UCL"), by labeling, marketing, advertising, promoting and selling the Products as "All Natural" when they are not all natural.

73. Defendant's conduct is unlawful, in part, for violating the CLRA and California's False Advertising Law (as discussed below).

74. Defendant's business practices are unfair because misrepresenting the Products as "All Natural" is anti-competitive and further offends established public policies demanding fair competition. Defendant's conduct is also unethical, immoral, unscrupulous, and oppressive. Further, Defendant's conduct harms Plaintiff and Class members.

75. Defendant's conduct is fraudulent since the foregoing deceptive acts and practices are misleading in a material way. They fundamentally misrepresent the nature of the Products as being "All Natural" to induce consumers to purchase the Products and to deceive reasonable consumers who have relied upon Defendant's misrepresentations and/or omissions.

76. Plaintiff and Class members were injured as a direct and proximate result of Defendant's conduct because they paid for the Products, which they would not have purchased had they know the true facts: that the Products are not "All Natural" as advertised.

77. As a result of Defendant's violations of the UCL, Plaintiff and other members of the Class have suffered injury in fact and lost money or property. Had Plaintiff known the truth – that the Products contain ingredients that are artificial, synthetic, highly processed, and/or genetically modified – Plaintiff would not have purchased the Products. Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendant not engaged in unfair competition, by ordering restitution of all funds that Defendant may have acquired as a result of its unfair competition, and by requiring Defendant to engage in a corrective advertising campaign.

**FOURTH CAUSE OF ACTION**

**Violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.***

78. Plaintiff incorporates all previous factual allegations as if fully set forth herein.

79. By the acts and conduct of Defendant alleged herein, Defendant committed false

advertising by its misrepresentations that the Products are "All Natural" in conducting business, trade, and commerce in the state of California in violation of the False Advertising Law, California Business & Professions Code § 17500, *et seq.* (the "FAL").

80.     The foregoing acts and practices were directed at consumers and are misleading in a material way because they fundamentally misrepresent the nature of the Products as being "All Natural" to induce consumers to purchase the Products while Defendant had actual knowledge that these statements are false, or should have known by exercising reasonable care to determine these statements are false and misleading.

81.     Plaintiff and Class members reasonably relied upon Defendant's misrepresentations and/or omissions by purchasing the Products and, as a result, have been injured because they paid for Products they would not have purchased had they known they were not "All Natural" as stated.

82.     As a result of Defendant's violations of the FAL, Plaintiff and other members of the Class have suffered injury in fact and lost money or property.  Had Plaintiff known the truth – that Products contain ingredients that are artificial, synthetic, highly processed, and/or genetically modified – Plaintiff would not have purchased the Products.  Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendant not engaged in false advertising, by ordering restitution of all funds that Defendant may have acquired as a result of its false advertising, and by requiring Defendant to engage in a corrective advertising campaign.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation

83.     Plaintiff incorporates all previous factual allegations as if fully set forth herein.

84.     Defendant has represented that the Products are "All Natural" when in fact the Products contain synthetic, artificial, highly processed, and/or genetically modified ingredients.

85.     Defendant had no reasonable grounds for believing its representations were true.

86.     Defendant should have known about the Products' misrepresentations.

87.     In making these representations to Plaintiff and the Class, Defendant intended to induce Plaintiff and Class members to purchase the Products.

88. At all times herein, Plaintiff and Class members were unaware of the falsity of Defendant's statements.

89. Plaintiff and Class members reasonably acted in response to Defendant's statements when they purchased the Products.

90. As a proximate result of Defendant's negligent misrepresentations, Plaintiff and Class members purchased the Products.

91. As a result, Plaintiff and Class members have been economically damaged in an amount to be determined at trial.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint that are so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in his favor and against Defendant, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B. Ordering Defendant to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiff and the other members of the Class;

C. Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

D. Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and the other members of these Class;

E. Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

F. Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

G.     Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

H.     Ordering such other and further relief as may be just and proper.

Dated:  April 8, 2015                                Respectfully submitted,

**AHDOOT & WOLFSON, PC**

_/s/ T. Wolfson_
Tina Wolfson
twolfson@ahdootwolfson.com
Theodore W. Maya
tmaya@ahdootwolfson.com
Bradley K. King
bking@ahdootwolfson.com
1016 Palm Avenue
West Hollywood, California 90069
Tel: 310-474-9111
Fax: 310-474-8585

Counsel for Plaintiff and the Proposed Class

**AFFIDAVIT OF TINA WOLFSON**

I, Tina Wolfson, declare as follows:

1. I am an attorney with the law firm of Ahdoot & Wolfson, PC, representing Plaintiff Ian Dedrick ("Plaintiff") in this Action. I am admitted to practice law in California and before this Court, and I am a member in good standing of the State Bar of California. This declaration is made pursuant to California Civil Code Section 1780(d). I make this declaration based on my research of public records and upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2. Based on my research and personal knowledge, Defendant Snack Factory, LLC ("Defendant") does business within the State of California, and Plaintiff purchased Defendant's Products within the State of California, as alleged in this Class Action Complaint.

I declare under penalty of perjury under the laws of the United States and the State of California this 8th day of April, 2015, in West Hollywood, California that the foregoing is true and correct.

_____
Tina Wolfson